FILED
October 05, 2010
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0002977790

J. RUSSELL CUNNINGHAM, State Bar #130578
KRISTEN DITLEVSEN, State Bar #259162
ERIC R. GASSMAN, State Bar #260693
DESMOND, NOLAN, LIVAICH & CUNNINGHAM
1830 15th Street
Sacramento, California 95811
Telephone: (916) 443-2051
Facsimile: (916) 443-2651

Attorneys for J. Michael Hopper
Chapter 7 Trustee

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

In re:

GINA COOPER

Debtor.

Case No. 10-32967-C-7
Chapter 7

MET-1

Date: October 12, 2010
Time: 9:30 a.m.
Place: Courtroom 35
501 "I" Street, 6th Floor
Sacramento, CA 95814

## REPLY BRIEF IN OPPOSITION TO MOTION TO COMPEL ABANDONMENT

J. MICHAEL HOPPER ("Trustee") opposes abandonment of the subject limited partnership interest because he shares the debtor's belief in the long term value of the aggregate $7.5 million investment she has made to date. The motion was a hasty response to Trustee's initial request for financial information and provisional protection of non-exempt profit distributions. The motion is based on incorrect assumptions and unreliable evidence. Despite the short unambiguous words used in DNL-2, the related motion for turnover, the debtor wrongly believes that Trustee is interested in managing the business owned by the subject limited partnership. Without offering any objective evidence, the motion also incorrectly assumes that

1

the debtor's former spouse would not be required to bear his fair share of capital gains tax and subsequently invested capital. The expert testimony offered by the debtor consists of a biased conflicted accountant and an appraiser who has ignored the obvious in order to tailor his value opinion to his client's litigation needs. Since the debtor has not met her burden of proof, the motion should be denied.

### A. THE ESTATE HOLDS A LIMITED PARTNERSHIP INTEREST.

1. The motion's broad prayer for abandonment of all property of the estate is problematic because: (a) the debtor's schedules have been amended twice; (b) both the Orchard Crossing Apartments real property and the partnership interest used by the debtor to hold the apartments are listed separately in Schedules A and B; (c) the description of the partnership interest has changed in the latest amendment from a 99.998% general partnership interest (subject to some management restrictions) to a 99.999% limited partnership interest (subject to full management restrictions); (d) the December 2008 partnership agreement amendment that changed the partnership interest (from general to limited) was first disclosed as an exhibit to the debtor's supplemental brief despite prior Rule 2004 subpoena; and (e) the deadline to object to the latest exemption amendment has not yet passed. The motion should not be granted as to any property interest not specifically identified and shown to be burdensome and of inconsequential value to the estate.

2. The supporting evidence proffered by the debtor is focused on the Orchard Crossing Apartments real property and business, and Orchard Crossing Limited Partnership ("OCA Partnership"), the entity used by the debtor to hold the apartments. Swept into the list of personal property the debtor seeks to force early abandonment from the estate, however, is "an uncollectible receivable from RTI Investments," which the schedules indicate is for $150,000. The motion offers neither evidence nor analysis as to why the RTI receivable is burdensome or of inconsequential value to the debtor's bankruptcy estate. The motion should be denied as to the RTI receivable.

2

3. The instant abandonment motion was filed on July 3, 2010. The original schedules were filed on May 17, 2010, and amended on July 3, 2010 and September 14, 2010. The December 2008 amendment to the OCA Partnership agreement, first referred to in the latest schedule amendment, reflects that the nature of the debtor's interest in OCA Partnership is that of a limited partner (with no management rights at all), instead of a general partner (whose rights of control were subordinate to those of a separate corporate managing partner). To the extent dependent upon allowance of an exemption presently claimed by the debtor, the motion should not be granted prior to the expiration of the exemption objection deadline.

4. While the debtor's apparent inability to convey consistent and accurate information is cause for concern, this latest disclosure further undercuts the debtor's mistaken belief that Trustee is interested in taking on the day-to-day management of Orchard Crossing Apartments. The estate's stake in the partnership is a limited one. The sole general partner is Orchard Crossing Apartments, Inc. ("OCA, Inc."). Turnover of a limited partnership interest, particularly one that is tightly wrapped up in a web of contractual management restrictions, would be no different than turnover of stock in General Motors. At this point, like any stockholder, Trustee is entitled to receive declared dividends and accurate information from company fiduciaries, but is not entitled to manage OCA Partnership or possess Orchard Crossing Apartments. The motion should be denied as to OCA Partnership and, to the extent OCA Partnership's assets are determined to be property of the estate, denied as to those assets as well.

### B. BARTHOLOMEW'S DEPOSITION TESTIMONY UNDERCUTS HIS REPORT.

5. Bartholomew revealed flaws in his appraisal at deposition, which undercut the reliability of his opinion of Orchard Crossing Apartments' value. He stated "there wasn't much time to complete the [appraisal] assignment" in general, and cited examples of the time limitation's effect on his work. (Transcript, 25:8-9; 26:21-25; 27:4-6; 58:4-8). As a result, his work appears not to have been thorough, nor his opinions well-supported. For example, the paired sales analysis he used to try to determine a market trend, in his own words, "don't lead to

3

a specific answer that's very – that's highly meaningful;" and the analysis "talks – but it's not the most certain," so he appears to have relied heavily on the opinions of brokers, rather than his own analysis of market data – determining a market adjustment of the same percentage brokers reported to him. (Transcript, 53:16-54:11; 58:3-4; 54:15-55:7).

6. Bartholomew barely spoke with the Orchard Crossing Apartments property manager Dante Shaw, with whom he had no "substantive discussion," and only met briefly because Shaw "happened to be in the room" when he visited the property. (Transcript, 27:20-23; 29:3-14). He determined the property has drainage issues based on nothing but visual observation, and he considered its water heater/boiler system to be a disadvantage without investigating its costs. (Transcript, 50:11-52:7). He made up to five percent (5%) adjustments to his comparable sales for parking upgrades but did not investigate what the cost of such upgrades would be. (Transcript, 83:20-84:4). He determined that management of Orchard Crossing Apartments is only average, in large part due to its lack of "pretty brochures," which warranted a ten percent (10%) downward adjustment to one of his sales. (Transcript, 89:16-90:16).

7. As to the effect of an affordable housing covenant on the property, although Bartholomew cited a number of what he perceived to be negative aspects of the covenant that he has used to justify a higher cap rate for the property, he *could not quantify any particular effect it has on the property's value*; he admitted that currently, and for the foreseeable future, the rents on the property are and will remain at market rates, and that "with affordable rents at about market levels, there wouldn't be a noticeable premium or discount paid" for the property as compared to properties not subject to such a covenant. (Transcript, 60:22-61:16; 62:22-64:5; 64:9-65:4; 68:11-19; 69:1-10; 69:19-73:18; 74:19-75:5). He also admitted that "a fair number" of the apartment complexes in Fairfield are similarly encumbered by affordable housing covenants. (Transcript, 69:11-14). And, in fact, in his sales comparison analysis, he made *no adjustment* for the covenant, stating, "Do I think it's a huge problem for the property? No." (Transcript, 75:14-20).

8. It became clear during Bartholomew's deposition that there are a number of issues with his comparable sales ("comps"). When talking about flaws with one of his comps and his

4

inability to verify pertinent information regarding the sale, he stated, "I didn't place a great deal of weight in – in analyzing all these sales. I mean I realize that it adjusted reflects about where I think the subject belongs. But when you can't interview somebody associated with the transaction, then I think it probably *doesn't deserve high weighing in the analysis*." (Transcript, 102:18-103:9). However, earlier he had stated, "It's all about the comps," and that he "did a rather detailed look for sale comps because that's critical to the valuation." (Transcript, 29:19; 24-30:1). Moreover, a significant element of his capitalization rate ("cap rate") analysis utilized in his income approach relies on data from his unreliable sales. When pressed, he admitted that his comps are in his mind "meaningful for cap rate data" but, not "all that significant in regard to sales comparison," stating quite shockingly, "I mean would I hang my hat on that? The answer is I did. But would I place a large bet on the hat-hanging? Probably not." (Transcript, 108:1-7; 12-14).

   9. Bartholomew's cap rate analysis is similarly afflicted with significant problems. First, he deemed a low cap rate from a comparable sale located in Fairfield, which was sold the most recently of any of his comparable sales, "an anomaly," and stated "the rates reflected by [sales] 4 and 5' – the *Sacramento* properties – "in the 8's are really what the investor expectation is in this marketplace," despite the fact that he made adjustments of twenty percent (20%) and ten percent (10%), respectively, to his Sacramento sales for location difference. (Transcript, 47:2-24; Bartholomew Report, 44). Additionally, he offered a survey cap rate figure of 7.43 percent in Fourth Quarter 2009, which in his report he acknowledges had gone down at least 75 basis points by the First Quarter 2010, but at deposition stated, misleadingly, "So as of the end of last year, the rate expectation by – in their survey indicates about 7-and-a-half percent, but the market has deteriorated since then. So we're looking at something *north of 7-and-a-half percent*." (Transcript, 53:15). He has not provided any data for Second Quarter 2010, whereas Trustee's appraiser has included data through the second quarter, which indicates a continuing trend down to 6.51 percent. (Nicolaou Report, 20).

5

### C. LINDA FEIL'S DECLARATION IS OF LIMITED EVIDENTIARY VALUE.

10. The proffered expert opinion will likely be excluded because the omission of Feil's educational background, formal training, published works, and recent expert testimony in other cases leaves the reader guessing as to her qualifications.

11. Fiel's bias is patent because she: (a) has been the debtor's accountant for many years; (b) conceived the partnership structure by which the Orchard Crossing Apartments were transferred in disregard of the rights of the debtor's former spouse; and (c) provided the aggressive tax advice the debtor now blames for mistakes in her original schedules and statement of financial affairs.

12. Fiel's conflict of interest is equally obvious since she is both a director and chief financial officer of OCA, Inc., an entity that stands to benefit from insulating the Orchard Crossing Apartments from the claims of the debtor's unsecured creditors whose funds were most recently used to capitalize that business. OCA Partnership has now appeared in the matter, for the obvious purpose of heading off transfer avoidance claims contemplated by Trustee.

13. Feil's reliability is also called into question by admitted errors in her preparation of prior tax returns for the debtor that understated expenses and overstated profits. Unlike most accountants who must rely on information provided by a taxpayer client, in this case, as chief financial officer of OCA, Inc., Feil cannot credibly deny that she knew or should have known the information was incorrect at the time the returns were filed.

### D. CALCULATION OF PATRICK HUTCHINSON'S SHARE IS UNCERTAIN.

14. The family law judgment incorporated a property settlement agreement that provided that upon sale of the "real property and business interest known as [Orchard Crossing Apartments]," Patrick Hutchinson is entitled to the lesser of "one-half of the net proceeds of sale of the property" and one-half of the community equity when the judgment was entered, then stated to be $8.5 million value less $5.5 million liens, i.e. $1.5 million. Since the agreement does not identify the deductions allowed for purposes of calculating the "net," Patrick Hutchinson's share of a hypothetical immediate sale of the Orchard Crossing Apartments will depend upon a

judicial determination of the extent to which the debtor is entitled to deduct: (a) costs of sale; (b) secured claims; and (c) capital gains tax.

15. It is not likely that Patrick Hutchinson would dispute that reasonable costs of sale should be deducted. The 8% costs of sale assumption of the debtor's accountant, Linda Feil, however, is obviously inflated. Even the debtor, a licensed real estate broker, acknowledged that for property of this type, i.e. a 100-unit apartment complex admittedly worth over $6 million, the commission rate could run as low as 3%. In light of the slow economic climate for real estate brokers, 4% is a reasonable assumption for costs for an $8.1 million apartment complex.

16. It is not likely that Patrick Hutchinson would dispute that secured claims should be deducted to the extent of the $5.5 million mutually owed when the judgment was entered. While a subsequent re-finance cleared Patrick Hutchinson from personal liability, the current balance of the secured debt has grown to about $6.3 million, exclusive of a $1.3 million penalty if the property is sold before 2016. Thereafter, the debtor invested an additional $600,000 capital to improve the property and profitability of the business. Since Patrick Hutchinson's share of the sale proceeds is the lesser of two figures, it is likely that a court would allow for deduction of the current secured debt, even though it exceeds $5.5 million.

17. A court's resolution of a dispute between the parties on deduction of tax consequences is difficult to predict. Patrick Hutchinson would likely prefer a distribution net of taxes because the capital gains rate applicable to the sale of the entire asset, in most cases, would be less than the ordinary income rate that would be applicable to a pre-tax distribution of Patrick Hutchinson's share.

18. The parties acquired the Orchard Crossing Apartments by way of a tax-deferred exchange pursuant to Internal Revenue Code Section 1031. Despite a $6.9 million purchase price, according to the debtor's accountant, the exchange basis was about $5.8 million. The debtor acquired Patrick Hutchinson's interest in the Orchard Crossing Apartments real property and business via a combination of an interspousal transfer deed and granting provisions in the property settlement agreement. A court is likely to interpret those devices to have effectively conveyed the entire $5.8 million tax basis the debtor. After the divorce, the debtor: (a) paid

Patrick Hutchinson $200,000 as an equalizing payment; and (b) invested an additional $600,000 into Orchard Crossing Apartments, improving the property and strengthening the business' rental revenue. The debtor's basis would likely be adjusted upwards by these items, subject to downward adjustments to the extent distributions are treated as return of capital (as reported) as opposed to compensation for services rendered (now contended). Based on the foregoing, but for the debtor's secret transfer of the property to OCA Partnership, a court would likely allow for deduction of capital gains tax as part of the net proceeds calculation.

19. The debtor's transfer of the Orchard Crossing Apartments into OCA Partnership without Patrick Hutchinson's knowledge or consent, unless avoided by Trustee, raises partnership taxation issues the resolution of which is difficult to predict. The property settlement agreement provides for a judicial lien to protect Patrick Hutchinson's right to receive, upon sale, the lesser of $1.5 million and the 50% of the net sale proceeds. If a court interprets that to mean that Patrick Hutchinson now holds 50% of the 99.99% limited partnership interest received by the debtor in return, separate calculations of the capital accounts of each of the limited partners would be required. Indeed, the debtor would have even more reason to recant her prior tax reporting of distributions as return of capital while Patrick Hutchinson would dispute characterization as compensation for services rendered to the extent same exceeded reasonable value.

### E. THE DEBTOR WANTS MORE THAN A FRESH START.

20. The debtor contends, without explanation, that keeping her case open to administer an asset would deny her a fresh start. However, neither Trustee nor any other party in interest has objected to discharge. Indeed the debtor's discharge was entered on August 26, 2010.

21. The debtor contends that Orchard Crossing Apartments is the only venue for her talent and skills. However, if the value of those services is truly 5% to 10% of annual gross rents of about $1 million, as the debtor contends, then the $50,000 to $100,000 management fee would more than make up for the $16,000 annual lost Social Security benefits.

8

22. The profit and loss statement proffered by the debtor as Exhibit D to her opposition to Trustee's turnover motion reflects that for the first 6-1/2 months of 2010, net of draws aggregating $54,600, net income was $22,200, for a total of $76,800. Given the evolving factual landscape Trustee and the Court have been subjected to in this case, the debtor can not be relied upon to provide accurate information.

23. The debtor seeks to invoke sympathy from the court without providing sufficient information. At the last 341 meeting on August 20, 2010, Trustee requested that the debtor amend her Schedule I to disclose her current spouse's income. To this day, however, that information has not been provided by way of amendment to the schedules.

WHEREFORE, Trustee prays that the motion be denied, and for such other and further relief as is necessary and proper.

Dated: October 5, 2010  DESMOND, NOLAN, LIVAICH & CUNNINGHAM

By: _____
J. RUSSELL CUNNINGHAM
Attorneys for J. Michael Hopper, Chapter 7 Trustee

9